We move to the third case this morning, Nelson v. Great Lakes Educational. Good morning, and may it please the court, Daniel Zibel on behalf of Appellant Nicole Nelson. This case is about the ability of a student loan borrower to use generally applicable state consumer protection laws to redress harms that were caused when the servicer of unfairly, deceptively, and in a way that was misleading. More specifically, Ms. Nelson has asserted that although Great Lakes advertised itself as an expert advisor that would provide her with individualized, objective advice that was in her best interest when choosing among loan repayment options, in reality, Great Lakes was acting in its own pecuniary interest and was systematically steering borrowers into repayment plans that were to the borrower's detriment but were financially advantageous for Great Lakes. The district court granted a motion to dismiss in this case holding that Ms. Nelson's claims were expressly preempted by 20 U.S.C. section 1098G, a provision of the Higher Education Act that bars the application of any state law disclosure requirement on servicers of But section 1098G is not that broad, and the claims brought by Ms. Nelson are not based on any affirmative disclosure requirements of Illinois or federal law. The district court granted the motion without prejudice and gave you leave to replead, but you chose not to. Why didn't you attempt to replead and plead around the ruling? I think, Your Honor, when we looked at the district court's decision below and the way the district court had framed the preemption issue, I think Supplemental Appendix, page 10, where the district court said essentially that any communication that revealed facts that were not required by federal law or required by law constituted a preempted disclosure. That left us really with no wiggle room, and we decided that it was better to come here instead. The touchstone, of course, of any preemption analysis is to look at the intent of Congress through 1098G and what Congress was actually trying to say. And when you look at those words, disclosure requirement, nothing in those words indicated that Congress intended to displace the historic role of state law on policing consumer protection issues. Congress carefully chose narrow words, disclosure requirement. Congress could have gone broader. And I think, actually, if you look at Great Lakes' brief at page 20, they actually concede this point and suggest, as we would agree with, that, quote, Nelson may be correct, but Congress did not intend that all communications between a borrower and a servicer are disclosures and state tort law could play a role in curbing misinformation servicers provide to borrowers outside of the disclosure context. That is precisely what the case, this case, is about. Mr. Zeebel, is it correct that you are, in essence, relying on the distinction between affirmative misrepresentations and failures to disclose? I don't think it's, I wouldn't frame it quite that way, Your Honor. I think what we are basing our position on is the distinction between a law, an Illinois state law, that requires disclosures and something else on the other hand, and we would fall into that something else on the other hand bucket, and I think that's kind of framed in two ways. One, nothing about the Illinois Consumer Protection Law actually required Great Lakes to say anything. This is a case largely about allegations that Great Lakes chose to mislead, deceive, act fraudulently, act deceptively. That's why I framed this in terms of affirmative misrepresentations. You don't seem to like that? I think I was, I guess I was focusing more on the misrepresentation piece and less on the affirmative, but yes, I would agree with you that the preemption requires there to be an affirmative, a law that affirmatively requires Great Lakes to have said something. The, and as I understand it, your focus is on two misrepresentations. Expertise is the first, and the second is we're acting in the borrower's interest in providing this advice. Is that right? Those are the, those are the allegations that I think form the crux of the complaint. I think, you know, when we get to trial, it's more of a pattern of deception and a pattern of what the calls were like and how they would, how they would engage in the communications, but fundamentally they were holding themselves out as providing advisory services that were not required by federal law and certainly were not required by Illinois law either. Do you contend in this case that the defendant violated federal law in any relevant way in this case? That is not an issue in this case. This is not, this is not like, for example, the Bible case where it was sort of bootstrapping a contract claim into the federal, the federal regulatory requirements. I think to really look at what Congress meant when Congress was talking about disclosure requirements, the history of this provision is really quite important. In 1982, Congress sought to amend the Truth in Lending Act. At that point in time, there were essentially two disclosure regimes that were set up, one under the Higher Education Act for higher education loans and one under the Truth in Lending Act for truth, for a sort of broader subset of loans, and Congress said this can lead to duplicative disclosures. There's duplicative requirements that, that the lenders and the servicers have to tell the borrowers, so let's get rid of the Truth in Lending requirements for the Higher Education Act loans. And that works sort of in that world, except for the fact that the Truth in Lending Act also allowed certain states to apply to the Federal Reserve to opt out of TILA where there were substantially similar state laws. So, if Congress had left sort of the first provision of what was in the 1982 Act, which is 701A of that law, which only exempted the Truth in Lending requirements, there still would have been this issue of what was required under the state for the states where the states had opted out of TILA because of the substantially similar, and so that's where you get to 701B of the 1982 law, which is now codified in what's in 1098G. But we don't get to that analysis if we find that the preemption provision in 1098G is clear on its face. That's correct, Your Honor. I think, and I do believe it is clear on its face in this case, but yes, you wouldn't need to go there. Okay. So you agree that the disclosure is clear on its face? The express preemption provision is clear on its face? Yes, Your Honor. Yeah, except you disagree about what it means, so I don't know. I disagree. I mean, it's hard to say. Even the district court grappled with it a little bit and said there are these two equally compelling versions of disclosure requirement. Do you think that the preemption provision in 1098G is limited to disclosures at the time of the origination of the loan? No, Your Honor. I think, in fact, if you look at what's in 20 U.S.C. Section 1083, which actually lists out required disclosures, those go at all sorts of different times during the life cycle of the loan. So you think those are covered? The additional disclosure requirements, the post-origination disclosure requirements? I think if the state of Illinois imposed a disclosure requirement that would take place sometime down the road if a borrower is having trouble making payments, for example, I think that would be in the same set of circumstances as what would be covered otherwise. I do want to raise briefly the conflict preemption issue that was raised at the district court. It was not addressed by the district judge below, but it has been raised here. And I think Great Lakes is not asserting, nor I think could they, that this is an instance of impossibility preemption, as it's certainly not impossible to comply with Illinois state consumer protection law on the one hand and federal law on the other. And what we're talking about is obstacle preemption. In looking at obstacle preemption, the first step is really to see whether, in the patriotic veterans case, the construction of the law would do major damage to clear and substantial federal interests. The Higher Education Act is clear in its purpose, and its purpose is to help students pay for college, to help finance paying for college, and to help students repay their loans through the various repayment plans that the federal government has authorized. And it would be odd, to say the least, to suggest that somehow laws that require companies not to mislead and not to deceive borrowers are somehow at odds with the purpose of the HEA, as Congress did set forth. If there are no other questions, I will take the rest of my time. Thank you, Counsel. Ms. Rapp. Good morning. I'm here on behalf of the Great Lakes Educational Loan Services. The federal government certainly has a unique, extensive, multifaceted, and deep interest in federal student loans. It holds nearly $1.2 trillion. That's 45% of its total financial assets in student loans. That's lots of money, and the federal government has done lots to protect its investment. The federal government has developed a comprehensive statutory and regulatory framework, has exercised its procurement authority, and has developed a robust regime of extensive oversight over its servicers, one that includes robust protections for borrowers. Considered against this expansive federal backdrop, it is clear that this case is not about ensuring that borrowers are protected. They are, as I hope we'll discuss in full detail, amply protected. It is instead about the federal government's ability to create and administer a student loan program, to extend credit, and to contract with borrowers, and to contract with servicers. Nelson, at her core, is using state law to challenge what a servicer told her about IDR plans in particular calls. She's doing that without regard to other communications, including a mass of formal disclosures that she received during the life of her student loan, and she's doing it without regard to the extensive oversight that the Department of Education and the federal government plays in administering the student loan program and over servicers. The federal government, the Department of Education, detailed some of this oversight in a statement of interest submitted in a case involving Massachusetts against another servicer, FIA, and then in March 2018, in an interpretive guidance that it published in the Federal Register. In it, it outlined a variety of oversight that it takes over servicers, including audits, regular reporting, listening to calls, fielding and having a forum for getting borrower complaints, and then acting upon those complaints if it notices particular problems. So it's fully occupying the space and engaged in oversight. Are you arguing for field preemption? I think that there would be a strong argument for field preemption. Has any court accepted that argument? It has not, and that's not my focus today. Good. Okay. So my focus today really is number one on the plain language of 1098G. You can try to narrow it, imparting TILA on it or imparting 10... Could you address the distinction between a failure to provide information and an affirmative misstatement? I think it ultimately comes down to artful pleading in my mind. I think that... No, it doesn't. Look, in common law fraud, it's a familiar distinction, right, between affirmatively misstating the facts or affirmatively making a false promise to somebody and simply failing to disclose. There's this whole body of constructive fraud where there's a fiduciary duty to disclose. That's a familiar line. Why is that not applicable here? You're addressing an important question. I think that comes in line drawing. So would you have a line in this case, and where would it be if you're trying to limit what the express preemption provision would be? Affirmative disclosures, affirmative misrepresentations versus failure to say something else. Right. I would say an example of an affirmative misrepresentation, if you were looking for one, would be the Jenna case. In the Jenna case that's cited and discussed in our briefs, a student loan servicer said, we're going to sign you up or we're going to carry over your automatic ACH payments. It did not do that. So you think that was correctly decided? I think that preemption could be stronger. I think the Department has occupied this field. I think the Department has a way for us to complain. I thought we were getting away from field preemption here. I think in terms of the specific question you asked about what the line is between an affirmative misrepresentation versus a nondisclosure, that would clearly be covered by the preemption statute. I believe that that is a good, solid line that you could draw in the sand. Sorry. The line between affirmative misrepresentations and failures to disclose? I think the line that I would have would be if you're misrepresenting. This case, for example, and I'm going to make a distinction and I'll get back to it. Question. This case involves what a borrower was telling somebody about things sort of in the ambit of talking about their repayment options within their student loan. In that case, they're not involved in that conversation. In the Jenna case, it was I'm going to do X or Y, and then they fail to actually do X or Y. To me, that would take it out of the 1098G, just disclosure about repayment options. Okay. How about a statement, in essence, I'm acting, borrower, as your fiduciary? We had a section in our brief, a table, and I think that these all ultimately amount to failure to disclose in the context of a conversation about student loans. That's like a failure to disclose that I'm lying, right? If that trick works, and that's what parts of that chart look like, then the distinction is erased. So let me go back. How about servicer for the lender says, I'm acting in your best interests? I think the flip of that would be that you'd want them to say, I'm not acting in your best interest. No, just not to claim falsely that you are acting in their best interest, to put them off their guard. I think it's important to keep in mind in looking at these lines, too, because I understand what your concern is. And this gets into the discussion, too, that appellants are trying to make between a disclosure and a communication. Ultimately, the Department of Education, Congress has charged the Department of Education with really administering the student loan program and determining how borrowers are communicated with. The Department of Education has detailed certain formal communications that come out, and there's a whole host of those that come out. In addition, the Department of Education administers servicers and has a lot of oversight over them. And the Department of Education, as part of that, looks at these calls, is auditing these calls, is routinely listening to calls, and if there was a concern about any of these calls and the disclosures that were being made, the department could address that. So trust the government is the answer. What you're making sounds like an argument way outside the pleadings for conflict preemption, and you've raised that in your brief, but I don't understand how we could really decide that issue on this record on the pleading. I don't think we need to get there because I think that if you look at the plain language, first off, of 1098-G, it's not cabined in. It's very, very broad. It says any disclosure requirement of any state law, and this is Congress knowing about TILA and all sorts of things. Then you take the Department of Education, which has been charged with administering this, and whether you want to give it Skidmore deference or our deference or whatever deference, I think that it has said multiple times that that term doesn't only mean sort of the shea. It's not cabined in by shea or anything else. It means misrepresentations. It means any omissions, any sort of disclosure that there would be. Okay, but they're relying on shea, right? The Department of Education? Yeah. I think the Department of Education certainly cited shea, but I think that if you look at that whole context of that interpretive guidance, it was much broader talking about the administration of the student loan program as a whole. But it obviously overlooked the critical passage in shea, right? The one that says, by the way, breach of contract, fraud, et cetera, are not covered by 1098-G, right? Shall I quote it? I know I'm familiar with what you're talking about. I thought you would be. Yeah. I think if you read that in the whole context, not just the disclosure section, the Department of Education is clearly stating that it has created remedies, it has ways for borrowers to raise complaints, and it occupies this space. And you can call it, I think there's an express preemption provision here that we could rely on exclusively for this case. There's also conflict preemption that would be broader. But the Department of Education is clearly trying to. That's tougher, though, when you've got an express preemption claim, right? And you are not arguing impossibility, are you? No, I think that this would be more of an obstacle preemption case. But I think when you look at the Department of Education's charge with administering the student loan program, you've got a Department of Education who's listening to calls, monitoring calls, has a way for borrowers to actually raise complaints, which was not done here. But the way to raise complaints is really to have the department address it. And we're talking here about a department that's been charged with. So do you disagree with our decision in Bible that allows, for example, a breach of contract remedy for failure to comply with regulations incorporated into student loan contracts? I believe that Bible's a different case. There you've got a contract claim that is predicated on compliance with the HDA. That's different than this case where you're trying to. But it provides a private civil remedy under state law. Right. It does. But that's, I think, a separate issue than a case here where you're trying to take state law, impart it on a phone conversation that the Department of Education is monitoring that really involves the types of disclosures. Do they monitor them all? They monitor a lot of calls. How do we know this? I think you take the Department of Education's words, if you look at the interpretive guidance that it issued in March 2018, you look at its statement of interest in FEA, it is very robustly on a daily basis involved with its servicers. And if a borrower had a particular concern about a particular call, they could raise that with the department and the department would address it. And I'll note if you look at footnote six in that FEA decision, the department talked about some issue had come up and it actually worked on a remedy with the servicer. But ultimately it's up to the Department of Education to weigh often conflicting interests of taxpayers on the one hand, it has a whole lot of money in this, and borrowers, and determine out what, if any, remedies do. So I think this case can be decided very narrowly on the express preemption provision. The argument you just made, though, was conflict or field preemption. I don't think that you need to go there in that case, this case. I think that you can focus exclusively on or rely exclusively on the plain language of 1098G. It says any disclosure requirement of any state law. I believe that if you actually take at their core what all the claims are here, they're about things that should or should not have been told during a conversation about repayment options. Two points. We're acting in your best interest and we're experts. And the Department of Education, I will note, has been charged. If you look at, and this is, again, in that interpretive guidance, the Congress charged them with getting servicers that have demonstrated a lot of expertise and ability to do this program. So in a way the department was charged with finding experts to help do servicing on its behalf. Plato's assertion, though, is that's just false. Maybe they can prove it, maybe they can't. But ultimately it's up to the department to figure it out. And it's not injecting a bunch of different state standards is really going to go against the sort of historical arc of servicing. We started with a fell loan program where we had a decentralized system with lenders that were pretty state-based and guarantors that were definitely state-based. We moved to the direct loan program. The federal government's holding all the money. It's investment. You've got the Department of Education administering this program. It's been charged with finding expert servicers and monitoring those servicers. And now we're moving to the next-gen procurement, which is going to be more centralized with a single servicing platform, a single branded solution, maybe multiple servicers, but a single website. So the arc is moving more and more towards centralization. There's an express preemption statute that talks about sort of any disclosure not being subject to any state law. Could you address, Ms. Rapp, the rationale of the plurality in the tobacco case, Cipollone? That was the narrower rationale for the court's decision. And in particular, their conclusion that the preemption statute there did not preempt claims of breaches of state law duties not to make false statements or misstate material facts. I think there's a couple things to point out. And one, and I know that this gets more into conflict, but I think it's important to keep in mind when we're looking at Congress's intent and the Department of Education's interpretation of the preemption statute 1098G, but I think that the situation here is fundamentally different in kind than other types of situations where the federal government has some laws or regulations or standards. Given the Department of Education created a program, people don't have to participate in it. They don't have to take out a federal student loan, but they choose to participate in a federal student loan program. Well, I'm not sure that's exactly correct. And people don't have to smoke cigarettes. Point taken. But I think the federal government has a unique investment here, given that it holds over $1 trillion of these loans, and it's contracted with servicers. So this is involving fundamental rights. How does this address the express preemption interpretation here? I think there's two ways of addressing it. Where Chipalone basically takes, at least as I read it, a very different starting point for analyzing that. Again, going back to our earlier express preemption discussion, number one, I believe that these conversations are not sort of like the genotype misrepresentations where you're saying something well outside the ambit. The statements here were involved in the context of talking about student loan options. They were made, at least informed by, the Department of Education's charge by Congress to go find experts to service its student loan standards and help borrowers talk about these situations. As part of its big, complex disclosure regime. That's an argument that what was said was true, not that a claim is preempted. I think that it's related to that in that it's sort of part of the ambit of the discussions and disclosures that were happening when you're talking about student loan options and your repayment options. So I think that it is an argument for preemption. Thank you. Was the district court's focus on the plain language correct by focusing on what lenders have to reveal as opposed to disclosures about loans? The express provision says loans made shall not be subject to any disclosure requirements. In interpreting disclosure requirements, the district court focused on what lenders might have to reveal as opposed to loans. Was that the correct focus or should the disclosure requirement have been more loan-centric as opposed to lender-centric? Could you rephrase that question, please? Sure. In looking at the express preemption provision, the district court interpreted the term disclosure requirement. And the express preemption provision links the disclosure requirement to loans made. So it reads loans made shall not be subject to any disclosure requirements of any state law. In interpreting disclosure requirement, the district court interpreted that linking it to what lenders have to reveal as opposed to loans themselves. I understand your point. Was that the correct way to look at it or should it have been grounded on disclosure requirements of loans as opposed to lenders? I believe that it's broader. Or is it the same? I think when you're talking about a federal student loan, that would be the focus. So disclosures related to that in the ambit of what the Department of Education is overseeing vis-à-vis those loans, that would be how I would define it. I know I'm over. One thing I would love to address if I can are just remedies. I know that I would be concerned if I were a court, and this is a big focus, understandably, of the appellants. Are there any remedies for borrowers? And I just want to mention that there are a lot of remedies. There's Department of Education remedies. That was in that footnote six in the Massachusetts via case. The Department of Education has a lot of contractual remedies. It has procurement power. It's involved in one right now. It gives allocations out to servicers based on certain performance metrics, and it impacts payment based on loan statuses, and it's known to take legal action against servicers. It's also been known to terminate contracts of servicers. There's a couple of notable examples, one being ACS. Its first direct loan servicer terminated that contract. State Attorney General's offices have UDAP authority under the Dodd-Frank Act. There's the CFPB and the FTC. Have what authority? UDAP authority under the Dodd-Frank Act. Sorry, what is UDAP? I'm sorry. It's unfair, deceptive, and abusive acts or practices authority. Thank you. The CFPB and the FTC have authority, and student loan servicers, large ones, are supervised entities by the CFPB. Borrowers can bring administrative actions against the Department of Education if they don't like what relief they're getting. There's one now involving borrower defense to repayment. And then there's potential federal claims, barring the concept of intergovernmental immunity, which is something that the Department is arguing about in a case that's going on right now in the District of Columbia. So thank you very much for your time. And I ask that you affirm the decision below. Thank you, Your Honors. I just want to very briefly address a few of the points that counsel was making. The first regards to the Department of Education's notice of interpretation that was issued last March. As it relates to the express preemption portion of that notice, I should note that the Department relies on two things and two things only. One is the Che case, which, as Judge Hamilton noted, they sort of disregard a second portion of Che's discussion of express preemption. And the other thing that the Department raises in that notice is the district court's assertion below. And so for the Department to say or for Great Lakes to say that the Department's position should have some value where it's relying on the district court's decision below, that does have a good amount of circularity to it. More generally, the Department's notice was not put out after any rulemaking, after any public comment, which is something that courts look to when assessing the extent of the deference that's provided under Skidmore. And really it lacks, I would say it lacks a lot of clarity, particularly on the express preemption point, where it notes that things like credit reporting to credit reporting agencies, that that is somehow covered within the express preemption without any justification, no discussion. There's no discussion in the express preemption section on the history of the provision, on the language of the provision. It doesn't reference the Truth in Lending Act. And I would ask or suggest that it's not the kind of persuasive value that Skidmore instructs that we should be looking to. There is also, I think counsel made a number of statements about this, there is no private right of action in the Higher Education Act. That is clear. So for a borrower who has been aggrieved in the ways that Ms. Nelson has been aggrieved, the answer really is trust the government. And Congress could have done that. Congress could have said outright state unfair and deceptive acts and practices claims are preempted. Congress didn't do that. Congress chose the words disclosure requirement. And again, there's nothing about the plaintiff's claims in this case that relate to any state law requirement at all, other than the fundamental requirement, which was noted by the plurality in Cipollone, not to deceive, not to act untruthfully. And I should also add that the plurality in Cipollone was later upheld or adopted by the majority of the Supreme Court in the Altria group case, which I think that is ultimately the right construct here, that irrespective of the required statements in the cigarette context, there was still the fundamental obligation not to deceive, not to mislead. In this situation, even though there are required disclosures that the federal government puts forth, there is still the fundamental obligation that rests on all businesses operating within the state of Illinois not to deceive, not to act untruthfully and not to act unfairly. And that is what this case is about. Mr. Ziebel, if we were to reverse this case, you have not yet pursued class certification. It sounds like the case is going to depend a lot on oral statements in individualized telephone calls. That's certainly something that's being pursued or was starting to be pursued in discovery. That you're going to have, how do you deal with that in a class action? I think things like policy statements, how call reps are incentivized, whether they're incentivized based on the training materials, how they are paying their call reps in terms of is it volume, forbearance, is it a much faster process to get borrowers into which is sort of the crux of the underlying complaint as opposed to trying to get So not so much on what was said particularly, but what the basis for it. I think most would probably be relevant to the case, but certainly the practices that were involved. What the outcome is. What the outcome is and also how the representatives get there in the call centers and what they're told to do, that's all something that would need to come out in discovery and quite frankly be proven at trial. So I would ask that this court reverse the decision of the district court. Thank you, counsel. Thanks to both counsel and the case is taken under advisement.